Marcus King-Knight v. Rachel Singer, Dr. Craig O'Connor, et al. Good morning, your honors, may I please record? My name is Ugo Uzo, and I represent Mr. King-Knight. The lower court's decision here dismissing the complaint in its entirety is erroneous for several reasons, but as we did with the brief, I'm going to focus on the malicious prosecution claim and the fabrication of evidence claim. With respect to those claims, the lower court in dismissing those claims, the lower court determined that the complaint does not plausibly allege that the police officer has falsified any records. But both the complaint and the record, those are very clear that the officers did. The complaint definitely discussed the fact that Detective Gary falsely stated that he was informed by an eyewitness here, Nikita Williams, who he claimed informed him that she had known Mr. King-Knight. From the neighborhood, from several years, and that she would often see him out in the neighborhood. But as the complaint made clear, Ms. Williams eventually, actually to support that argument, because Detective Gary eventually testified at a Rodriguez hearing. And to bolster his statement that he was informed by Ms. Williams that she had known Mr. King-Knight for several years and that she would often see him in the neighborhood. Now to get to the details that you're in there, that you're reciting now, just in terms of our own convenience in thinking about this analytically, there's the indictment question and then there's the fair trial question. That's right. I mean, first of all, we have to start off with considering whether the indictment itself was, whether it was Melissa's prosecution, was there a probable cause, and is there a presumption of probable cause by virtue of the fact that there was an indictment. And so that's one thing to address. And then the second thing to address is the fair trial claim, which gets into all the question of Williams' statements and whether they were in effect developed by Detective Gary in such a way that he was, you know, he was influencing the prosecution that way. And which resulted in what one would call a fair trial problems. So which one are you on now? Well, you know, I want to address the presumption of probable cause. That makes sense. Do that. I want to start with that first because, and that's how I actually believe I started out, because the fact that Detective Gary presented false information to the prosecutors who relied on the information that he gave them to initiate the prosecution. But the problem is that we don't know what was done in the grand jury and how much was presented in the grand jury that might have undermined that, to establish what was presented and whether they acted on the basis of false information. They returned an indictment. And normally when you return an indictment, that's the end of it as far as the malicious prosecution is concerned because probable cause is presumed. And you're arguing that somehow probable cause should not be presumed here, I guess, but that's a high hurdle to overcome. Well, yes, and I do agree, but the complaint was dismissed at the motion to dismiss stage. At this stage, we're not really required to prove evidence that was presented in the grand jury. What we are required to demonstrate at this stage is that the information, to be able to overcome that presumption of probable cause, the information that the police gave to the prosecutors that led them to initiate the proceedings in the first place, that that information was false. And that is what the complaint itself demonstrated. And then the grand jury took over, right? I mean, then the prosecutor went into the grand jury and there was something happened in the grand jury, we don't know exactly what, and they returned an indictment. So tell us, normally nobody gets access to the grand jury, but what actually occurred during the grand jury testimony? There were two witnesses that testified in the grand jury. One was Nikita Williams, the eyewitness, and the second witness was Colleen Shepard, the victim. The key to this case is not whether the shots were fired. The key to this case is who did it, who was identified. And Shepard couldn't identify, but Williams did identify over a period of time in different ways, and her identification became more and more detailed as time went on. And I think you're suggesting that she was coached, in effect, by Geary. That is our contention, Your Honor, because the way the identification proceeded, initially she, on several occasions prior to the identification, she was clear that she didn't know who committed it. Because there is an indictment, there's a presumption of probable cause, and as soon as there's probable cause in the case, that's the end of it, that's just prosecution. But the fair trial question, which is your second claim, is the one that interests me more, whether or not false information is generated, which had the case gone to trial and were to go to trial, it would be false and there would be a fair trial problem. And, Your Honor, that is also our argument that here, based on the false information that Geary, Detective Geary, presented to the prosecutors, which led actually to initiation of the criminal proceedings in the first place, that that basically denied, deprived Mr. King of his authority. Now, the other thing is this was done on a complaint, correct? This is a complaint, and the complaint was dismissed. Yes, Your Honor. So we haven't had discovery. There has been no discovery. There has been no discovery, and so the question is, based on the allegations in the complaint itself, is there a plausible fair trial argument? That's right, that's the standard we're looking at, correct? Correct. That is correct, Your Honor, and the complaint itself makes clear that the officers, particularly Detective Geary, presented this false information. And actually, the criminal court complaint itself, which is also on the record, Detective Bencosme, who swore to that criminal court complaint, indicated that he was informed by Ms. Shepherd, who, as we know, throughout the record, did not make any identification. But in the criminal court complaint itself, he swore that he was informed by Ms. Shepherd that she was basically shot by Mr. King. So there's a lot in the record. She never testified to that fact. She was unable to identify the shooter, Ms. Shepherd, right? There was never any identification proceeding involving her, but Your Honor, to your question, she did testify in the grand jury that she was shot by Mr. King Knight, even though she never, ever identified him. She had multiple occasions that she could have identified him, but she never did. And the police never conducted any, as a matter of fact, Detective Geary testified at the Rodriguez hearing that the reason why they never had her conduct any identification proceeding was because she didn't know. She told them she didn't know who shot her. So there's a lot on the record about the officers misrepresenting the record. And that's also in the complaint. Detective Geary himself, too, claimed that he, after this mysterious lady who magically appeared somehow and told him that the… I think the other side has a problem with the mysterious lady because Detective Geary never got her name. There's no report. It's just a statement by Detective Geary that this woman showed up and said, there's a person by the name of, I think it's King, who was the shooter. That's correct. That's it. And so that was, you know, and he never, there weren't any records kept of that. It was just his statement, right? That's correct, Your Honor. It was just his statement. He just wrote this. And the, as a matter of fact, after he wrote that statement, according to him, he took no other action on the case for seven days. I understand that just followed from that was that he then asked the manager of photos to send over photos that matched King, maybe Marcus King, I guess, at that point. I don't know, but it was King. And he got eight or nine photos, but he, there were, he only picked out the one, and that was Marcus King Knight. Correct. That was the only Marcus King Knight, and he picked that out of that. And for some reason, it didn't do anything with the others. He just, I'm not even sure, I think they lost him. That's correct, Your Honor, because they threw out the entire criminal proceeding, and there were two trials. And then the next thing he did. There was never any. Right, and then just to be clear on the facts, the next thing that he did with that photograph was show it to Williams in the car on September 9th. With its, together with, it was a mug shot from an earlier arrest. That's correct. And it had the details of that earlier arrest, including his full name, etc. That's correct, Your Honor. And she had never mentioned his full name up to that point. No, Your Honor, she didn't actually. Well, she actually said she, clearly that she doesn't know Mr. King Knight, that she knew of him. So one of the questions is, she then testifies that this issue was raised at trial. And the judge said, well, I'm going to let the photo come in, but also let her identify him in court. And she did identify him in court. I think it's your argument that by that time, she was made aware of, she'd seen a picture of him and his full name. So it was, that identification in court could have either been from the picture or from what she saw. But what she saw never resulted in an identification up to that point. Correct. And actually, to go back, Your Honor, our argument was that immediately after that, the mysterious lady informed Gary that it was Mr. King Knight that did this. He did absolutely nothing else for 10 days. But we know, and Mr. King Knight knew from his family who used to live around the same neighborhood, that the police were going around the neighborhood with a wanted poster of Mr. King Knight and saying, this is the person who did this, and we are looking for him to arrest him for the crime. So that is, when we say in the complaint that there was confidant witnesses with false information, is the basis for that claim that there was actually an individual, Rizzo. The individual's nickname, I believe, Rizzo, his real name, Frank Blair, who some of the witnesses, the lady, the hostess of the party where this shooting occurred, actually informed the police that, in very clear terms, that she thought that that was a shooter because they knew this Rizzo around the neighborhood to be basically a troublemaker who was also a member of the Blood Street Gang, and that she had never seen him around the neighborhood for years until after that. But what you're giving us now are evidentiary details, and we haven't had any evidence in this case. All we have is a complaint. That's correct. And the question is, is the complaint plausible enough? Is it sufficient enough to be plausible to allow the case to go forward into the evidentiary phase? Is that where we are? Yes, Your Honor. My submission is that there's a lot in the complaint that should allow at least the… There's a lot of debate over whether the statements in the complaint are conclusory or not conclusory or whether they're supported by detail or not detail. My question is whether there's enough in the complaint to say that there's a plausible claim of a fair trial denial here. That is correct, Your Honor, based on the fact that we're still at the early stage. The fact that the complaint identified made factual statements about how the officers, particularly Detective Geary, lied about some of the circumstances of the arrest. That is enough, at least at this stage, to allow Mr. McCluskey to be able to proceed to discovery, to be able to support his claims, Your Honor. Can I ask just kind of a legal question? As we're reviewing the complaint, we know that there was a Rodriguez hearing, that the trial court held a hearing. And the question in the hearing was whether Williams' identification in court could be relied upon or whether it was tainted by the admittedly very improper processes that the police officer used in getting her to initially identify. And the court, and she gave an explanation about why she didn't initially identify him, and it wasn't that she didn't recognize him until later. She had a reason that she was scared to identify him because she thought that that might endanger her. The court believes that, and it concludes that however improper the police identification processes were, and it was very improper, it didn't taint her independent recollection of who it was that fired the shots. Is that conclusion, that conclusion after hearing by the trial court, is that something that binds us in this case as we're looking at your complaint? Is that a given that we have to accept, or are you free to relitigate the question of whether her testimony was tainted? Well, you know, I don't believe that this court is bound by criminal, state criminal court decision. So why not? Well, because, and based on the record, it's very clear that Ms. Williams herself is incredible. She definitely made several statements here and there that she changed over time. Let me ask it this way, because I'm not sure the answer can be we're not bound because it was wrong. I think the answer has to be, I mean, there was a contested hearing, and there was a ruling adverse to your client after he was represented. And typically, that would be a ruling that he couldn't challenge in some later proceeding. And so there's got to be a reason why the sort of normal rules of issue conclusion don't apply here. Maybe the incentives were different or something. Can you frame an argument in that framework, or maybe not? Well, your Honor, I believe the court's case in Bermudez, if I'm not mistaken, it's similar here. I mean, it can definitely relate to this case, because in that case, this court indicated that in certain circumstances where, and this is actually clearly one of those cases where a witness, because the witness has started lying, pushed to lie, and the witness started lying, that there's always a chance that the witness would continue that belief in what he or she is saying. And in that kind of situation, this court, I believe, would be free to make a determination as to whether or not the criminal court decision would be binding on the court. But like I said, like I set it out, you are saying too, the record here is very clear that this witness cannot be trusted. Neither can the police officers who started this. And we also have to remember that because of this, this is not a simple case where Mr. King Knight ended up a day or two in prison. Because of this, he got locked up for probably 13 years, and that is a lot of deprivation of rights. Based on police basically waking up and making up a story about a lady approaching them and giving them Michael King Knight name and relying on that to push a witness. Okay. We've let you go a bit over, Mr. Uzo, but you'll have some rebuttal time. Thank you. Thank you. You can lower the podium with the black box. Hold it down a little bit. Give it some more pressure. It's okay. Good morning, Your Honors. Taha Esadria appearing on behalf of the respondents. A good portion of what my colleague speaks about in terms of the credibility of the witness is not really an issue pertaining to whether or not there was a malicious prosecution or whether or not there was a fair trial claim. For purposes of a malicious prosecution, whereas here there was a grand jury indictment, there is a presumption of probable cause. And so plaintiff bears the burden of making allegations as to what happened at the grand jury that could have caused the indictment to be procured by fraud or similar misconduct. And here, even though plaintiff had copies of the grand jury minutes, he makes no specific allegation as to what it was that actually happened at the grand jury. With respect to the fair trial claim, there is no plausible allegation that the testimony of or the identification by Williams was fabricated. There is a plausible allegation that the single photo identification procedure was suggestive. But there's no plausible allegation that her testimony was coerced. There is no allegation that she— No, but if it was improperly influenced. In other words, there was a name by that time of the person so that, you know, Marcus King Knight, and that there was at that stage a narrative. Then it seems to me that it's possible that this is—that the photograph, the individual photograph, took over the entire case in terms of what happened after that. That's what concerns me. I think that the issue there is—so we have this suggestive identification. And so then that is then what the independent source hearing was about. At the independent source hearing, the—I mean, all of the issues with respect to what was problematic about the single photo identification procedure were explored. And the criminal court, you know, agreed that it was—that this was a suggestive identification, but nonetheless found that the—Williams had sufficient prior familiarity with the plaintiff and had sufficient opportunity during the course of the incident to observe him at close range. I mean, there was like conversations that were happening, and he was at one point— It was a little confusing to me why she wasn't able to name him because later on it turned out that there was quite a bit of contact. I think it was her—the father of her child was a friend of the plaintiff. Well, there was—I mean, yeah. There was a little bit of a complicated relationship. But yeah, her child's father's cousin had dated him. But I think that, you know—I mean, she provided an explanation as to why she was—it wasn't—why she was unwilling to name him previously because she was afraid to. And the criminal court judge found that reason credible and found that— Well, I think that it breaks the chain of causation. And so it's—the decision to permit the identification at trial was made by the criminal court after hearing all of the testimony, the evidence. And so what the causation of—so the introduction of her testimony of her identification was caused by the criminal court's determination to allow it. Am I misunderstanding, though, that the fair trial claim actually can look backward to things that happened before the trial? Even if the trial itself at some point the causation is broken, if the process is initiated and there's an impingement on his liberty as a result of the process being initiated on the basis of essentially trumped-up identification, right? That's the argument. Is that a fair trial argument in itself regardless of what happened later in the trial in terms of tainted evidence? Well, my understanding—my understanding of the fair trial claim is that, you know, the police officer—I mean, A, there's like the police officer forwarded, you know, false information that was likely to influence—that was likely to influence a jury and that that resulted in his detention or in his liberty detention. And here, I mean—but there—my understanding is that a determination by the district attorney to proceed with the prosecution despite knowing about whatever problems there were or the determination by the criminal court to allow the introduction of identification as evidence despite, you know, problems— you know, whatever alleged problems with the—with an identification procedure, that that breaks the chain of conversation. Well, it's not—we don't just have the identification procedure here, right? The allegations are that he made up an informing witness that didn't exist, the person who supposedly said, oh, I think whoever was the shooter was named Marcus. He then lied to prosecutors that Williams told him the name and the description of Mr.—the plaintiff, Mr. King Knight, before she was confined with the picture. And then he lied to prosecutors—yeah, both of those—that she gave a name and description before their meeting and that she knew him from the neighborhood. So all of that collectively—and I'm not sure we can definitively determine on the basis of the complaint that the prosecutors knew those things were all lies when they made the decision to move forward. So I'm—that—what I'm trying to figure out is—and I think part of the theory does rely on the notion that to the extent the prosecutors rely on Ms. Williams' testimony, it was tainted. And I'm trying to figure out whether we're bound by the later determination by the trial court that her testimony wasn't tainted even though the procedures were improper. Are we bound by that? And if so, why? Well, I think that we are—I think that—I mean, there was—certainly there was an opportunity to challenge the introduction of the evidence and the taint. And at—I mean, at—certainly at the hearing, I mean, the—again, it's like all of these issues were aired. And so the district attorney was plainly aware of whatever issues there were at that time. Well, the alleged lies by Officer Geary, how do we know—when you say they were aired— I mean, there was—I think— The taint question was aired. The taint question was aired. Right, but whether he lied in making up the informing witness and whether he lied about what she supposedly told him before the suggestive photo identification, that wasn't really the issue at that point. It was whether or not her testimony was tainted by it. Right. Well, I think that the—well, I mean, I think that the relevance of the—I mean, I think the—certainly the relevance of whether or not there was a conversation prior to the identification. Whether or not there was this conversation really goes to whether or not the identification was proper. I mean, whether it was a proper confirmatory identification or it was not a proper—or whether it was an improper single photo identification. And I don't think that there is, you know, at any—you know, at this point, like, there's no dispute that it was an improper single type. But after her identification was followed up on this improper identification and her exposure to that. Right, but that is the whole purpose of—I mean, that's the whole purpose of the independent source hearing is to determine whether, despite the fact that there was this improper identification procedure, whether or not she had either sufficient familiarity, prior familiarity with him in order to make a valid identification, or whether or not she had sufficient opportunity to observe him during the incident. And the criminal court found that both things were true. Can I just ask you, so with regard to this—the court, criminal court finding that the identification was not tainted. Yes. If we were, just hypothetically, let's say we were bound by that. And so there's a ruling out there that her ID was not tainted. And, you know, as you pointed out, the prosecution is aware of this when they go forward with the case. With regard to the other allegations of falsity as far as the witness or the person who told Gary the name, you know, someone named Marcus King, and with regard to the statement—assuming, let's say, assume it is false that Gary lied about saying that Williams had, you know, about—that he was—he had, in fact, said something to her prior to showing her the photo. About it being Marcus King. So let's say that those two allegations of Gary lying— The allegation that he lied about having—her having said to him— Right, prior to showing the photo that she had already in some way flagged that it's King. Yes. Okay. So assuming that those are actually both lies—  But the independent source ruling is, you know, binding on us still. Yes. Is there—how do those statements—how would that impact the claim here, the fair trial claim, I guess, is what I'm getting at. Because it's not clear to me that if the issue is whether or not her identification is false, and that's resolved to be determined, well, there were bad procedures, but she actually was able to identify him. Yes. I'm not sure—I guess, you know, do you think there is a relevance to those other allegations of falsity as it goes to his fair trial claim? I don't think—I think that all of these allegations of falsity that are contained in the complaint, I think that they all go to the question of whether or not the single photo identification procedure was proper. I mean, I think, you know, if—because, again, like, if he already—if she had already said that she knew him from the neighborhood or from wherever, then it could be proper to show a single photo just to confirm that this is actually the person. But, you know, I think that that, again, though, is like we go back to, yeah, the single—I'm sorry—the independent source hearing was—the purpose of it was to determine that despite the fact that this was not a proper—that the single photo identification was not proper, she had an independent basis—an independent basis for her identification, and so, therefore, the court was allowing the identification to go forward. And, I mean, I think that— But she had not—prior to seeing the photograph, she didn't ever testify to any independent basis for knowing this guy. Am I correct on that? That all came up afterwards. Yes. I mean, there wasn't any testimony. So it seems to me that what happened with the photo array is relevant to the question of the so-called independent identification. It wasn't really independent. I mean, she said, oh, yeah, there he is sitting over there. But she'd seen the photograph and was told that this photograph was just for her confirmation because—for her signature, and that was it. So, again, this is—again, this was—that was the whole purpose of the independent source hearing. And the criminal court determined that actually she—he—the court credited her testimony that she actually had known him from the neighborhood she had seen. She knew specifically that his relationship with, like, a cousin of her child's father and that she had seen him around on a number of occasions. And also that she had, during the course of the actual incident, that she had ample opportunity to observe him. I mean, so that—and so that determination— So what you're saying is there could be no plausible claim of a fair trial problem. So the—what I'm saying is that, you know, based on—based on a suggestive identification, you know, that—that there's no plausible claim based on that because the determination to allow the identification was made—at trial was made by the criminal court judge following an independent source hearing where all of the issues relating to, you know, the possibility of taint were fully explored with cross-examination and attorneys and possibility of introducing additional witnesses and the whole thing. And—and—and we're bound by that. Is that your argument? That is my argument, yes. That we are bound—that we are bound by that, that that is an independent determination that breaks any kind of change—a chain of causation to what any of the detectives—the detectives did. And there is no plausible allegation here of fabrication in the sense of coercion because there is no allegation—specific allegation that the detectives made any kinds of threats or made any kinds of promises or otherwise did anything that would suggest that the—William's testimony was not voluntary. Okay. All right. I think we have your argument. Thank you. Thank you very much. May I please support you on—I—I would just like to follow up with the question whether this court is bound by the criminal court's decision. And I don't believe, again, that the court is bound. There's actually the Bermudez against the city of New York, 790 F. Todd, 368 is court's opinion in 2015 on this very specific issue. Could you repeat that citation? That's 790 F. Todd. F4? F. F3? 3D. 3D. 368. And that's a 2015 case that was authored by this court. And the court—if I—there's a specific language from the court. had adopted a story, either because of a suggestive presentation of photographs or because of a more overt cohesion by the officers, they might very well have decided to stick with that story or become convinced that it was true. And for that reason, may have misinformed the ADA when they subsequently questioned them. Do you know if that case involved an independent source hearing where issues of suggestiveness and all of that were—if you don't off the top of your head, that's fine. Yes, and I do believe that there was an independent source hearing there, too. And I'm not specifically sure exactly what happened there, but the matter being, the court actually did find—this court did actually find that the DA knew about the misidentification or the pressure by the police to have the witnesses identify the plaintiff in that case. But the fact that the court decided to allow the fair trial claim to proceed was because the court thought that based on the suggestive ID by the officers in that case, that it likely was the basis for the witnesses in that case to continue to lie. Why? Because the witnesses eventually recounted their testimony at the criminal court. They eventually did recount the testimony and testified that they were pressured by the police to falsely identify the plaintiff in that case. So this court did allow a fair trial claim to proceed based on the fact that because of the pressure by the police in that case, that that was probably the reason why these individuals continued to lie, even though they knew that the plaintiff in that case did not commit the crime. That's exactly what happened there. The other problem here that seems to me that exists is the fact that the process that was followed by Detective Geary was never fully aired in the—told to the prosecutors and told to the court. He just did this identification, said, we've got a photo identification without exploring what other problems there were, which was that he was keeping information to himself and he wasn't—he didn't explain how he came up with—it's still a mystery to me—how he came up with a particular photograph with the full name of King Nigel in it. The others were Kings, and he happens to pick King Night out, and we don't know anything about the other photographs. They were—disappeared, and I don't think that was fully related to the judge or to the prosecutors. No, your honor, it was not. I mean, I obviously am not— So that brings us to a case called Hicks against Marchman, in which we said that there could be an independent finding of—a finding of an independent source, but that was tainted by the fact that the detective lied about the procedures. He didn't fully disclose the procedures that—and the mistakes that were made. And that is actually, your honor, is what happened here. The Detective Geary and Detective Bencosme, who knows how they ended up with Marcos King Night, but they identified him and they pressured the witnesses. It's not clear at this point in time because we're still at the early stage, and obviously we don't have all the records yet, but— Can I just interrupt you for a second? With regard to the idea that they were pressuring witnesses, your friend on the other side suggested that your fabricated evidence due process claim is about solely the identification issues. And so I'm just—in terms of any allegations about the detectives pressuring witnesses, I don't know that—have you made specific allegations in the complaint beyond just—I know there are statements in the complaint saying the detectives coerced witnesses. Those allegations to me seem very general, and so in terms of what you've alleged in the complaint, the allegations about the identification are, to my mind, specific. But this idea of coerced witnesses, I don't see sort of specific allegations in your complaint about that. It doesn't say the detectives pressured this witness or that witness or they did this or that. There's just a general allegation about this. Yes. You know, like I said, those are not very clear, and I admit, but the complaint also did say that after Detective Gary magically came up with this lady who identified Mr. King Knight, that he shot down everything. There was nothing on the record about any activities until he met with Ms. Williams about nine or ten days later and gave her this information. And actually there was, I believe, a complaint stated that he did actually call Ms. Williams ahead of time and let her know that he was bringing this photo for her to identify the individual who did this. That in itself is an inducement of a witness to pick somebody. And I think that goes to the identification question. I'm just saying more broadly, it seems like you have some general allegations that the detectives were coercing witnesses and pressuring people. And the specific allegations I see are with regard to Williams and her identification and what they said to her. I'm just, I guess, questioning if there is a basis for your claim independent of the identification and Williams-related activities. And it doesn't appear that your complaint makes more broadly coercion claims that are plausible or sufficiently detailed. Well, but the complaint is also clear that Detective Gary lied, and that's one of the basis for fabrication of evidence. But you say the complaint is clear he lied. I mean, you say he lied, but it's not sufficient just to say he lied. Well, he lied to the prosecutor. Obviously he didn't tell the prosecutor the truth. And that was the basis for the prosecutor initiating the proceeding in the first place. And that was the basis that Mr. King Knight had to go through all of this. It was the basis for denying him his fair trial claim. It's not just based on suggestive photo ID. It's based on the fact that the police lied about all of these things, lied about Ms. Williams informing them that she knew this person, that she used to go out with somebody that, with a cousin of whoever, you know, this individual, and blah, blah, blah. And that she used to see her for about two, she actually, he actually said that he used to play, she used to play video games with Marcus King about two or three times in a week for several years. And these were all information that the prosecutors relied on. Because we don't, I mean, after Gary testified at the Rodriguez hearing, the prosecutor actually said, that's it, we're done. The criminal court judge actually said, no, how can you say you're done? You can't, this individual is incredible. You can't rely on his testimony. And that's when he, the criminal court was able to convince the prosecutor to bring back Ms. Williams for the independent source. So it's obvious from there that the prosecutor's information, the prosecutor had was the information that Detective Gary gave them. Which the prosecutor relied to initiate the prosecution. And it's very clear that the prosecutor didn't know about the lie, very likely, until now when Ms. Williams reappeared and she said, no, I didn't say that to him. Okay. I think we have your argument. Thank you very much. Thank you to both of you. We will reserve decision on this case. Thank you. All right. Our next case for argument, ABC v. DEF. Okay. Mr. Ashmore, whenever you're ready. Good morning, your honors. May it please the court. I highlight our two principal contentions on this appeal. First, the final award and the decision below violate well-defined and dominant public policy found in FCA case law, the SOX statute in its case law, New Jersey and New York statute in case law, the analogous FLEASA case law, and the other employment-related case law we cite. And even recent NLRB decisions, one which was issued two weeks ago, I have it to hand to my adversary in the court, if you would like. Or we can file a FRAP 28J letter, if the court so wishes. All of these which make it illegal on public policy grounds to penalize a litigant for making truthful statements during litigation about illegal conduct and underlying wrongdoing that they challenge by bringing lawsuits. Second, when a party as here has no damages and undisputedly could not have had damages, a huge liquidated damages penalty of $750,000 and 9% state interest for over three years is unenforceable under Blacklawer law without even reaching the new provisions of New York general obligation law section 5-336, which was enacted while the case was briefed below. And in subsection 3, it has a bar on the return of any settlement proceeds or consideration when it comes to alleged breaches of clauses like the non-disparagement and confidentiality clauses here. As we noted in the brief, pages 42 to 43, FCA case law from Henry J.D. Uniphase, Siebert, and U.S. Axwell Rue make clear that, quote, whistleblower type information about allegedly unlawful acts, end quote, and the confidentiality clauses like what we have here are, quote, unenforceable as a matter of public policy because it would frustrate Congress' purpose in enacting the False Claims Act. Can I ask a question just about, you've provided a number of strong analogies that might suggest that a court should adopt a public policy exception to the enforceability of this confidentiality agreement in this contract. I'm trying to figure out whether in evaluating them, we come from the mindset that a district court might have in evaluating breach of contract claim in the first instance versus a district court reviewing an arbitration award for confirmation purposes. Is it the same question that you're asking yourself as a court? I would respectfully submit, Your Honor, that it is not. W.R. Grayson, its progeny, and I believe Judge Walker's decision in St. Mary, makes clear that public policy questions are for the courts. They're not for arbitration. And they're for de novo review. So the district court should review themselves. But I do submit to you that there is a manifest disregard argument insofar as these were all raised in the arbitration. The arbitrator knew of them, and he passed over them. Yeah, I think you answered a slightly different question. So I'm now asking not whether this is a question for the arbitrator. You're saying it's a question for the court. In answering the question, if you look at the case law that says, well, there might be a public policy exception here, it says the public policy must be well-defined and dominant and must be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. If a district court were addressing public policy, let's say this had just come up as a breach of contract claim in the court where there's no arbitration, I'm not sure the test for whether or not this would violate public policy that the district court would apply would be quite as onerous as the test that's described there. I think the district court might have more freedom to develop a public or acknowledge a public policy exception by strong analogy to other precedents. And I'm just trying to figure out whether I'm wrong about that, that there isn't sort of a higher bar that you have to meet because you're asking us to validate an arbitration on the basis of this public policy. Your Honor, our position is that when it comes to the pure public policy question, there is not a higher bar just because this originated or came into the district court out of an arbitration proceeding. And do you have support for that, though? Well, we would say St. Mary's decision is clear that public policy is one for the courts. And it's something that is renewed anew, and it doesn't matter that it arises. It doesn't matter the context in which it arises. The issue is, does the underlying decision violate public policy? But it's also framed by, I think that's...